COLCOCK, J.
The grounds upon which the appeal in this case is taken, lie in a narrow compass, At the trial the criminal objected to a juror, and demanded that he should be sworn on his voire ; .used relative to the prisoner’s guilt or innocence. *290 before he was sworn to set on the trial. The court refused, him this right, and said if he wished to prove prejudice, or the expression of an opinion by the juror, he must do it by other testimony. The crim--naj 0fl?ere¿ as evidence of a strong and inveterate prejudice, the records of the Court of Sessions, where it would appear, that he was not tried the term before, because the objections for the cause of the juror, did not leave a panel to sit; also, offered parol evidence to the same effect. The court refused this, unless it was was offered to change the venire.
The exceptions taken to the decision of the court are; 1st, That the criminal had a right to have every juror called to sit on the trial, first sworn on his voire dire, and examined, as to any opinions he might have expressed against the criminal. 2nd, That the evidence of general prejudice should have been received, in order to shew the necessity that the jurors should have been sworn on their voire, dire, as called to set in judgment upon him; and lastly, inasmuch as the decision in other respects, was contrary to law.
As there appears to be a- diversity of opinion on this case, and as it certainly is one of the greatest moment in the system of our jurisprudence, I have thought proper to trace to its origin the practice of examining a juror on his voire dire; in order by so doing to ascertain for what purpose, and to what *291 extent the practice was introduced or prevailed, and what the law now is on the subject.
It will be found that anciently certain persons were appointed by the court who were called triors, whose duty it was to ascertain, whether the jury were all impartial and qualified to sit; “ liberi et legales homines .” That the mode for summoning jurors in England was for the sheriff to return whom they pleased. Now, many may have been returned who were not possessed of the qualifications required in that country, and there might have been some difficulty in ascertaining, from other sources than themselves, correct information on this point. After the most diligent investigation that I have been able to make, I am inclined to think that hence originated the practice of examining jurors on their voire dire, merely to ascertain whether they were in this respect qualified to sit. And this I hink is supported by 3 Bacon, 267. Title Juries, Letter E. “ The truth of the matter alleged as ie cause'of challenge, must be made out by witnesses, “ to the satisfaction of the triors; also, the juror {( challenged, may oii his voire dire, be asked such “ questions, as do not tend to his disgrace; as, (( whether he has a freehold, &c. ? Whether he has u an interest in the case ? Whether he has given an opinion before hand upon the right ? which he might have done, as an arbitrator between the “ parties.” Co. Lit. p. 158. Trials per pais, 158. Salk. 153. One witness to prove the challenge is sufficient. Snow 173. as also, Tdxonleifs case, Fqs~ *292 ¿er P' Even there, it will be observed, thei’e is a limit beyond which the triors could not go. They were not permitted to ask questions tending to the disgrace, or the dishonor of the juror on his voire . dire.
If this is correct, there is no necessity of examining a juror on his voire dire in this state ; for every prisoner is entitled to a panel of the jurors, and may ascertain this, as well as any other fact relating to them, before his trial; nay, even after an arraignment, is entitled to a copy of the indictment, and three days to prepare himself.
But, I would ask, where are we to look for authority to support this doctrine; the ancient mode of proceeding by triors, has long since been done away; and, even while it did exist, was not carried to the extent contended for. Mr. Justice Blackstone, whose Commentaries are our text-book, in treating on the causes of challenge under the head to which . we would naturally look for information on this subject, says; ie challenges to the favour, are where , (i the party hath no principal challenge; but objects ie only some probable circumstances of suspicion, as <( acquaintance, and the like; the validity of which “ must be left to the determination of triors, whose (i office is to decide whether the juror be favorable (( or unfavorable. The triors, in case the first man e( called, be challenged, are two indifferent persons (i named by the court; and, if they try one mart “ and find him indifferent, he shall be sworn; and *293 {i then he, and the two triors shall try the next; and “ when another is found indifferent, and sworn, the (i two triors shall be superseded, and the two first {i sworn on the jury, shall try the restand he concludes his causes of challenge, by saying ; (Vol. 3. p. 364.) “a juror may himself be examined on oath of voire dire, with regard to such causes of challenge, as are not to his dishonor or discredit; but not with regard to any crime, or any thing which tends to his disgrace or disadvantage.”
Taking this then as the criterion, I say no question as to bias or partiality can be asked of a juror himself in a criminal case; for if I am correct in my idea of honour or credit, I should suppose it dishon-ourable, disgraceful, and highly disreputable, for a man to prejudge a fellow citizen on whose trial he was to sit. But if he should have done so, and be asked a question of this kind, he is reduced to the necessity of perjuring himself, or acknowledging what would certainly by most men be considered as dishonorable; and thus placed in a situation which is forbidden by every principle of justice and humanity. That a man should be made to disclose his secret thoughts savours strongly of inquisitorial power, and is as much at war with my feelings as my judgment.
But how would this doetrine operate in practice ? A man who is base in one thing, will not hesitate to be so in another. If the juror perjured himself, would the prisoner profit by it ? It is said the ob *294 jeCt js t0 ensure a fair trial; the means of course are justifiable. In the first place, the object would not he answered; and even if it could be, I have no ' hesitation, to say the means would not be proper, kecauge the same object can be answered otherwise. For ages past, by the provision of our law, persons accused, in addition to the privileges already enu-meratéd, may" in capital cases challenge peremptorily twenty, and for cause, any number against whom cause way be shown. Are not these sufficient guards for the most timid and cautious ? Is it possible, for a man to sit on a jury, who has any of those prejudices which it is the object of the law to guard against?
I would he understood as having no reference to a state of things in which party prejudice or political difference is permitted to weigh; for I should in those cases say, that the body politic was in a state of gangrene not to be cured ; at all events, not by ordinary means. It is not in human wisdom to provide against the evil of such a state of things ; it is therefore, improper to urge any arguments- grounded on it.
In searching for authority on this subject, I find a case which I take to be strongly in point as to the ¡general reasoning of the judges ; I mean the case of Peter Cooke, Salk. 158. wkere the chief justice said (i you may ask a juror upon his voire dire whether he have interest in the cause, nor shall he deny you the liberty of a-sking whether he be fitly *295 qualified according to law, by having a freehold of sufficient value; but that you may ask a juror or witness every question that will not make him eriminous, that is too large.”
I am against the motion.
Nott, J.
This case is resolved into the single question whether a juror being examined on his voire dire, may be asked and required to answei’, whether he has formed any opinion of the innocence or guilt of the prisoner whom he is called to try ; or any question which goes to shew his bias or partiality.
As an opinion appears to prevail in this state, that new doctrines on this subject have lately been introduced into the courts of the United States, bottomed on some provision of the constitution, not applicable to the state courts; or some rule of law in the particular state where the question has occurred^ I will premise that were there no other law or de-«ision on the subject, I should feel myself authorised by the rules and principles of the common law alone, to give the opinion which I am about to deliver. It is also necessary further to premise that formerly, in England, there were two ways of trying a juror, one by the court and the other by triors. When a juror was challenged propter affectum he was tried by triors. Co. Lit. 159. Note 2, 3. Blks. 363. But it is. now admitted that whatever be the cause of *296 challenge, the question is referred to the court; from whence, I conclude that whatever mode was formerly pursued to convince the minds of the tri- * ors,'is now to be followed to inform the mind of the cour^ Judge Blackstone defines propier affectum to mean, suspicion of bias or partiality. 3rd Blackstone, 363. Lord Coke says, if the cause of challenge touch the dishonour or discredit of the juror, he shall not be examined upon his oath; but in other cases he shall be examined upon his oath to inform the triors. Co. Lit. 159. Now xl propter affec-tum means a suspicion of bias or partiality, and it was only cases of challenge propter affectum that were referred to triors, and the jurors might be examined on oath to inform the triors, a fortiori, they might be examined with regard to their bias or partiality. It seems to be a settled rule of law in England that a juror may be asked any question that does not go to his dishonour or digrace. 3rd Blks. 364. Trials per pais. Hawkins P. C. Jacob’s Law. Co. Lit. 159. and surely it is not dishonourable for a person to form an opinion of a prisoner’s guilt against whom he has heard or seen convincing proof. Evidence may exist in such a shape that a man cannot shut his eyes or ears against it, nor be áble to steel his mind against conviction; and yet the proof may be ex parte and untrue. It may happen to the most honourable man, and thereby render him an incompetent juror, and-yet, not at all affect his character or his honour. It is incident to human nature, and no man need be ashamed to ac *297 knowledge that he possesses the frailties common all mankind. tO
The rule of law with regard to the examining a juror on his mire dire is precisely the same that relative to a wtiness. You may not ask a witness any question which goes to his disgrace; yet it never was refused to ask a witness if he had not formed, and even expressed an opinion of the cause, or of the person of whom he was called to give evidence. Co. Lit. 159. Note 2. I take it, therefore to be not only common law, but common justice to allow a prisoner this privilege. Some of the cases in the English books say, you may not ask a juror if he has not declared that the prisoner ought to be hanged, and give as a reason, because it is disgraceful. It may indeed be disgraceful in a juror to make such a declaration of a man he is called to try 5 nevertheless, a juror may have formed an opinion without incurring any disgrace, and may have expressed it in such a form that it would not be disgraceful for him to acknowledge it. Of as
But there may, perhaps, be other reasons why he should not be examined with regard to his declarations ; 1st, Because it may be unnecessary ; for, if he has formed an opinion, he is as much disqualified as if he had expressed it; 2nd, Because it is susceptible of other proof. But none of these reasons apply to an opinion not expressed.
Admit, however, that a juror cannot be compelled *298 to answer such questions, surely he may be permil-ted to (lo so. If he does net make the objection, no person can make it for him. The objection is in- ^ ” tended for his benefit, and if he does not think it ¿jSgracefuj to answer, the objection, though made, ought not to prevail. But in this case, non constat that the jurors were unwilling to answer the questions.
Having given my opinion of the common law, it cannot be weakened by shewing that the same principle has been recognized in our own courts. The first cases I shall notice, are the cases of the United States vs. Fries, tried in Philadelphia before Judge • Chase, and the United States vs. Callender, tried at Richmond before the same Judge. In both those cases, the prisoner’s counsel were allowed to examine the jurors, not only with regard to their opinions, but their declarations. And here it is worthy of remark, that the strong ground of impeachment af-terwards exhibited against Judge Chase, was the prejudice he manifested against those two individuals. With such prejudices as he is supposed to have entertained, he surely would not have allowed them this privilege, if he had not supposed it was a right which he could not withhold. For although the objection to Judge Chase was, that he required the questions to be put in such a'way as to defeat, in a great measure, the object of the examination, yet to permit at all, was a favour; and it could not be criminal in him to restrict in any manner, a proceeding which was altogether improper. And yet *299 Judge Chase was thought liable to impeachment for restricting those prisoners in the exercise of a privilege which it is now decided hv this court, ought not to be allowed at all.
The next case I shall notice, is the case of the United States vs. Col. Burr, tried in Richmond, before chief j us tice Marshall. This is the period, it appears to meat which a doubt was át first entertained on the subject. It has been called a new fangled doctrine introduced in this case at a time of great political ferment, bottomed on some new construction given to the constitution of the United States by judge Marshall, or on some law or practice of Virginia. But I have shewn that it has been contemporaneous with the English common law; that it had been allowed in two instances before in the courts of the United States. I believe I could mention other cases; but not having them before me, I shall omit them.
But what is more remarkable is, that Judge Marshall should be considered as the author of this new practice, when in fact the principal question was never decided by him. A motion was made before him by the prisoner’s counsel, to examine the jurors touching their opinions, and declarations$ and, as it was not opposed by the counsel for the United States, it was admitted as a matter of course. The question before Judge Marshall was, whether, when the jurors were examined, the bias was such, that they ought to have been rejected. But although the principal question was not directly decided by *300 him; yet, from his permitting the practice, and from the opinions he gave on points connected with it, it may be inferred, that he would have decided ' J _ . so. We have then, m addition to the reasons before gjveDj the opinion of two of the ablest judges, that ever sat upon the bench of the United States; and, from there being no opposition, we may fairly conclude, that the opinions of the enlightened bar of Philadelphia, as well as that of Richmond, are on the same side.
But we have also the decisions of the courts of this state, and until since the trial óf Burr, I never heard of one to the contrary. In the case of the State vs. Arnold, tried at Columbia, it was allowed on the part of the state, and exercised to as great an extent against the prisoner, as it wás in Burr’s case in his favour. In the case of the State against Jacobs, tried at Winnsborough, it was also allowed on the part of the prisoner. Whether that was before, or since Burr’s trial, I do not recollect. Armed with these high authorities, I cannot entertain a doubt that the prisoner ought to have a new trial.
But let us suppose the English books were silent upon the subject. Suppose we had no decisions on the point; is it not correct upon principle ? We know that the progress of public opinion, the practice of courts of justice and of legislatures, has been to relax the rigour of the law in favour of persons accused of great crimes. Formerly, they were not allowed counsel in England; next, counsel were per *301 mitted to instruct them in the law; but now, they are indulged in a full defence both in fact and in law. It is a maxim of the common law, that jurors should be (íomni exceptione majores,” and our con- . . , . , , ititution secures to every person accused a trial by an impartial jury. And how are the secret prejudices of jurors to be known, but by thus searching their consciences ? From necessity this practice must be allowed. I can see no inconvenience to the public from allowing it; but great danger may result to the accused by withholding it.
It is said that such a privilege would prevent prisoners from ever being tried. But it is not to be understood, that every unfavourable opinion that a juror may have ^itertained on common report, is to disqualify him. It must be a formed, settled opinion, creating so strong a bias, that he has not the exercise of an impartial judgment; and the evidence of the fact must be left to the discretion of the judge, as it formerly was to the triors. When such a prejudice does exist, the juror ought to be rejected, even though the prisoner never should be tried. It appears to me, that the inference to be drawn from the decision given in this case, is, that you must not examine a juror on his voire dire, for fear you may discover that he is determined at all events to convict the prisoner ; and that it is better an innocent man should be hanged, than that a practice should be permitted, by which a guilty one may have a fair trial, or possibly escape altogether.
*302 Smith, J.
This was an indictment for stealing a negro, tried at George-Town, at the April term, 1811, before Mr. Justice Grimke. . At the trial, the criminal objected to a juror called, without assigning any cause, and without exercising his right of preremptory challenge ; but alleged that he had the legal right to demand, that he should be sworn on his voire dire, and examined by prisoner, if he, the juror, had given any opinion against him before he was called, or had entertained any prejudices against him. The judge refused him this right, and said, if he wished to prove prejudice, or the expression of an opinion by the juror, he must do it by other testimony. The prisoner was found guilty. On the foregoing objection, his counsel moved for a new trial. • ,
It was contended on the part of the prisoner by Mr. Wilson, his counsel, that a considerable prejudice had prevailed in George-Town District, against this offence of negro-stealing, insomuch that a portion of the citizens of that district had signed a remonstrance to the governor, against pardoning such offenders, and that' this modé of swearing each juror on his voire dire, was the best mode the nature of the case would admit, of obtaining the highest evidence of the improper prejudice, or the expression of an opinion by the juror against the criminal.
In guarding the rights of citizens under this excellent mode of trial by jury, some care must be observed not to defeat the ends of public justice. If *303 so much circumspection and tenderness are observed as would, in all reasonable probability, secure a prisoner against the rash prejudices or wicked machinations of weak or evil minded men, it will be all the perfection that can be expected ; and any evils which should then result, must be ascribed to that inevitable imperfection incident to all human systems, and not to a want of humane laws, or to the injudicious administration of them. I think upon a full examination of the laws and decisions on this sub - ject, it will be found that the criminal’s safety is as well secured as it can be to secure the desirable objects of humanity, and of public justice also. Cookes case is an - old authority. The very principle contended for in this case was insisted on in that. He too, in order to find a cause for challenge, asked the jurors if they had not said he was guilty, or would be hanged. “ Et per Curiam. This is a good cause (C of challenge; but then the prisoner must prove (t it by witnesses, not out of the mouth of the jury- “ man. A juryman may be examined on his voire “ dire as to his interest or his qualifications, &e. (( but not to any point that will stigmatize him, &c. <e to make him discover of himself that which tends e( to shame, crime, infamy, or misdemeanor, &c. Salk. 153. This is the decision of the same principle, and the same reasoning almost verbatim, contained in Baldwin's case now before us. This doctrine was not lightly adopted, and on the next occasion, exploded. But this doctrine, and this very authority, is recognized by Lord Bacon, who says, u that the truth of the matter alleged as cause of *304 « challenge must be made out by witnesses to the li satisfaction of the triors; also, the jurors challenge< ed, may on a voire dire, be asked such questions (i as do not tend to infamy and disgrace; such as, (( Aether he hath a freehold, whether he hath an “ interest in the cause,” &c. And he cites Coke Litt. p. 158. Trials per pais, 158. Salk. 153. as his authorities.
Mr. Peake, in his Treatise on Evidence, mentions as authority, the doctrine as laid down by Lord Coke, on the subject of challenge, very much to the same point. He says, (( if the cause of challenge ie touch the dishonour or credit of a juror, he shall u not be examined upon his oath,” &e. Peake, 134. Also he recognizes Cooke’s case as good authority, where he says the whole court determined the juryman was not obliged to answer the question. This concurrence of English authorities serves to shew that this has been the law governing challenges, so far as respects the examination of jurors, ever since the time of Cooke’s case.
It is said by the counsel for the prisoner, that ehief justice Marshall, on the trial of Col. Burr for treason against the United States, admitted the prisoner to this privilege ; and the chief justice, in the report of that case, is made to say, that such a practice not only comports with reason and humanity, but that it is supported by the decisions and principles of the common law. The high standing of that gentleman as a jurist cannot be questioned; but *305 we cannot ascribe to him infallibility. The greatest men have erred. He may have taken up this question and decided on it hastily? or when there was a vast weight of legal learning and arguments? pressing on his mind? as it is wvell known that Burr’s trial lasted for many weeks. At least? I should be unwilling to subscribe to this opinion? unless Mr. Justice Marshall had pointed to his authorities under the common law? in support of his opinion-; and I am fortified in this course by the current of authorities before me? and to which I have already alluded.
It would seem as if the law of challenges? which Judge Blachstone calls “ a provision full of tender-i( ness and humanity to prisoners?” consulted in a peculiar manner, the safety of prisoners. They can first challenge the array? when there has been any partiality in the sheriff? under the English law? in summoning the jury. Under our law? the sheriff has no possible opportunity of exercising partiality. He has no option? but must summon such as are stated in the writs of venire. By the common law? a prisoner could challenge thirty-five peremptoidly? and now by the statute the 22nd of Henry 8th? made of force in this state? he can challenge twenty jurors peremptorily without assigning any cause whatever? and as many more as he can shew good cause for. A prisoner can challenge for cause which? if held insufficient? he may afterwards challenge the Same juror peremptorily. 3 Bar. 764. Coke Lit. 158. This gives him an opportunity of exercising *306 his right of challenge for cause twenty times, without impairing the right of peremptory challenge, and by that means protracting his peremptory challenges. By this liberty given him by law, he may test many of his challenges for cause, before his peremptory challenges begin. To enable a prisoner to-meet his trial to the best advantage, he is entitled to be furnished .with a list of all the jurors who may be called on his trial as soon as the jurors are summoned, and by this means he has a fair opportunity of enquiring into the character of each juror before his trial, by which he can judge of their understanding, their integrity, their virtue and temper, and select accordingly. Besides, when under all these advantages the prisoner has selected twelve who are to pass on his trial, it is to be recollected that they are to do so under a solemn oath, as well as the conscience of upright men who are to give a verdict between the prisoner and their country without any motive to err. And in addition to all this, the verdict must be unanimous. All the virtue of the twelve must be prostrated before an inno^ cent px’isoner could suffer. Now, under all these checks to the prejudices of jurors, I could scarcely deem it necessary to the safety of a prisoner, that the jurors who are always compelled, as it were, into this service, should be severally called up and examined on oath, to ascertain whether they entertained any private prejudices, or had before expressed an opinion on the prisoner’s case. I am, therefore, of opinion, it is not consistent with the rules of law and the previous-adjudications, that the *307 prisoner should have had the liberty to examine the jurors on their voire dire.
As I think it is not law, so I think it is not good policy. Peshaps there never was a wanton and 'unprovoked murder represented to have been committed, without rousing the honest indignation of every disinterested man in the community against the supposed perpetrator. But when honest men come to decide on his fate, under the solemnity of an oath, and the real facts are developed and made known to them in a court of justice, what possible motive can they have to persevere in an error that must be so fatal to innocence, and so repugnant to a virtuous mind. To say that this honourable recantation of sentiment should not be indulged, would be attended with the constant purgation of jurors, and the double opportunity afforded to offenders to elude the punishment due to their offences. It would be an incitement to evil, as it would multiply the chances as well as hopes of escape. I am, therefore, of opinion, the new .trial ought to be refused.
Brevard. J.
The prisoner was indicted in the Court of General Sessions for George-Town District for a capital felony; and upon his trial, in order to challenge one of the jurors for cause, who was called to pass upon his trial, he demanded to examine him upon oath, touching his opinions, prepossessions and prejudices, respecting himself (the prisoner,) in relation to the offence whereof he stood charged, and *308 whether he had not signed an instrument of writing purporting to be a petition to the governor, relating to the accused, to induce the governor to refuse a pardon in case of his conviction. The presiding jy¿ge refUSed to allow the prisoner this privilege or indulgence, and declared it was necessary to prove by other evidence than that which is drawn from his juror upon his voire dire, that he is not lawfully qualified by reason of partiality, prejudice or the prevalence of an opinion already formed and expressed, concerning the guilt of the accused, to pass upon his trial as an impartial juryman. I am of opin - ion that the prisoner was entitled to examine the juror upon his voire dire on the points proposed, under certain restrictions and qualifications.
Before I proceed to explain my opinion, and state the grounds and reasons of it, I shall premise that in proportion as the civilized world has become mor and more enlightened in relation to the nature and utility of government, legislation and jurisprudence, the treatment of prisoners, accused of crimes, has been more and more rational and humane. In rude and barbarous times, a prisoner charged with a capital crime was subjected to the most harsh and cruel treatment; altogether inconsistent with that humane and wise maxim, which ever presumes the innocence of the accused, and the spirit of that Divine precept which declares, thatl£i it is better ten guilty persons should escape, than one innocent suffer.” By the ancient common law, counsel was not allowed to any prisoner accused of a capital crime, nor was he allowed to ex- *309 cúlpate himself by the testimony of witnesses. 4 Blks. Comm. 355. 359. 3 Inst. 79. 137. 2, Hawk. P. C. 400. And if he stood mute, or challenged peremptorily a greater number of jurors than he was lawfully entitled to do, he was pressed to death with heavy weights.- This barbarity and injustice is now justly exploded, and many other ame-liorations, in the practice of the criminal law, have been gradually introduced.
I shall further premise, that in general, the same rules of law concerning jurymen and the right of challenge which obtain in civil cases, are applicable to criminal cases; and that the trial by jury, the justly vaunted palladium of British and American liberty, is more or less valuable in proportion as the principles of the common law, according to their true spirit and salutary provisions of statute law, in regard to the formation of juries and the conduct of jurymen, are carefully and correctly observed. It is of the last importance to the pure and impartial administration of justice, that jurors, who are the legal and constitutional judges of questions of fact and of the law also, where it is combined with the fact, and the exclusive judges of the credibility of witnesses, on which oftentimes depend the lives, liberties and estates of their fellow citizens, should be in the language of the common law, omni exceptione majores ; without just exception ; entirely impartial. 2 Hal. P. C. 264. It is agreed on all hands, that, if a juror appears to be partial, prejudiced, or under prepossessions, which may give an undue bias to his judg *310 ment, it is a good cause of challenge. But the difficulty arises from the manner of showing the undue inclination of his mind, by what evidence it shall be made manifest. It is conceded that a juror may be examined on his voire dire, touching his qualifications as a juror, so far as it respects his age, estate and condition as to alienage or the like ; but it is denied that he may be asked any questions, the answer to which may tend to his disgrace, reproach or discredit.
Upon an examination of the cases, relating to this point, it does not appear to me that they establish any certain rule on the subject; 6 St. T. 59. Fost. C. L. 7. 4 St. T. Cooke’s case. 1 Salk. 153. 2 Hawk. P. C. Book 2. c. 43. s. 28. It is clear, however, that a juryman cannot be asked any question, the affirmative answer to which would evidently expose him to a criminal prosecution, or would' tend to his infamy or disgrace. Beyond this, there appears no criterion or clear rule of law by which a voire dire examination on such an occasion, shall be controlled.
The maxim usually applied in the examination of witnesses; u nemo allegans suam lurpidudidem est audiendus,” equally applies in the examination of jurors, in a case like the present. In civil cases, it is said, a witness may be examined on his voire dire touching his interest in the event of the cause in which he appears to give testimony.- Esp. Digt. 707. But, it is also said, that a witness cannot be *311 compelled to give evidence against his interest. Kerb. 203. It is laid down (Coke Lit. 158. b.) that if the cause of challenge touch the dishonor or discredit ... . of the juror, he shall not be examined on oath; so, if it tend to his shame, infamy or disgrace. Trials per pais, 192. Keiling, 9. In Cooke’s case, (4 St. Tr.) some of the judges use the words crime, shame, infamy, disgrace, disadvantage, misdemeanor. If it should appear that a juror has declared his opinion concerning the matter in question, he cannot be impartial and ought not to pass on the trial of the cause : so it is said, if he has eaten or drunk at the expense of one of the parties. Bacon’s Abridgment, title Juries, letter E. Co. Litt. 156. C. 158.
Now, from all these authorities, if the reason of the law be attended to, it must rather appear, that a juror may be examined on his voire dire, and set aside as disqualified in consequence of the answers he makes, in all cases where the answers made by him, do not evidently and directly tend materially to injure his reputation, or expose him to a criminal prosecution. If the answers required will have this effect, he cannot be compelled to answer. If they do not evidently and directly tend to produce that effect, he ought to answer. If the answers required will have a tendency only to produce a slight degree of public censure, or excite harmless ridicule, they ought to be given, provided they are pertinent to show that the juror is not sufficiently impartial in the cause.
*312 it may ])e difficult, sometimes, to determine whether upon these principles the juror ought to be required to answer or not. Whenever this is the ease, it must follow, ex necessitate, that the juror s}iap have a right to decide ; for he alone can best judge whether the questions require such answers as will tend to implicate him in the manner mentioned or not. It would sometimes happen, no doubt, that one juror would answer freely and frankly without any fear of reproach or disgrace, questions about which, another would be very squeamish and scrupulous. No objection, however, on this score, ought, in my opinion, to outweigh the great advantage which would generally result from excluding from juries, those who are not qualified in the spirit of the law, to act the part of impartial judges. It is better that the feelings of jurymen should be wounded, and even that his character should sustain a slight injury from his own evidence than that the life of an innocent person should be jeopardised by prejudice or prepossession. And after all, I can perceive no material prejudice which any man's character could sustain from a candid acknowledgment of his precipitancy, weakness, or want of caution in forming an extra-judicial opinion, and declaring it, relative to the guilt of a person accused, or of harbouring an unfavourable opinion of him in general, or even of having endeavoured to prejudice others against him, if his conduct was not dictated by improper motives. Many men have strong but honest prejudices and prepossessions, which they are neither ashamed nor unwilling to *313 avow. These prejudices and. inclinations may ren-r ° , der them very unfit jurymen on particular occasions ; and if they are unfit, and that unfitness can be demonstrated from their examination on oath, what mischief or inconvenience could possibly arise from permitting it? I think none. At any rate, none in comparrison with the mischiefs likely to re-suit from not permitting it. I am of opinion, the motion in this ease ought to be granted.
Bay, J.
This was a case which was tried at George-Town before Mr. Justice Grimke. The prisoner was convicted upon very clear testimony? and the present was a motion for a new' trial, on the ground that the presiding judge, when the prisoner was put upon his trial, refused to permit his counsel to interrogate the jurors as they came forward to be sworn, and to compel them to declare, whether they had formed any opinion 'in their own minds as to the guilt or innocence of the prisoner, in regard to the offence with which he was charged, and which they were about to try. And also in regard to a paper which bad been signed by numbers in the district, praying the governor not to pardon him in case of conviction.
In support of the motion, it was contended by Mr. Simons and Mr. Wilson, that any question might be asked a juror which did not go to criminate himself, or to bring him into shame and dishon-our. That in small communities, no material occurrence can happen without its being generallv *314 known among the citizens at large, and popular prejudices are too apt to be taken up, and gain ground against supposed offenders for offences which militate against the interest of a large portion of any communjty -whatever. It is, therefore, to guard against these popular prejudices,’ and particularly the artful and insidious impressions made by influential prosecutors, that this great privilege is insisted upon in behalf of unfortunate men, in order that á fair and impartial trial might be had in a case where a man’s life is at stake. In support of the motion, 3rd Jacob, 576. was relied on, where it is laid down, that a juror may be examined as to any thing which is not to his dishonour or discredit; also Peake, 135. 141. where it is said, that nothing infamous or disgraceful shall be asked a juror; that it was a shameful and disgraceful thing for a man to take up an opinion before he had heard the evidence ; and it is just and proper to sift out and discover such prejudices, if possible; for if a juror was not free from prejudice, he was not fit to sit upon a trial.
It was also contended in support of the motion, by Mr. White, that if a juror should deny a charge of partiality, then it was time enough to get other testimony to prove it. Col. BürPs case Was also strongly relied on in favour of this doctrine, on behalf of the prisoner, where this privilege was allowed, by the Chief Justice of the United States, in favour of the accused. The Attorney-General de- *315 iiied this right, as olaimed by the counsel for the prisoner, and contended that it was not a common law right to interrogate a juror as to his opinions, concerning a matter he was called upon to try, before he had been sworn or heard the evidence, He admitted that a juror might be asked questions as to his qualifications as a juror ; whether he was a freeholder or not? or paid, in this country, a certain tax? or whether he was a citizen or not? but he believed the common law, did not go further. The eases quoted by the counsel for the prisoner, he said, if he understood them right, went to shew that a juror should not be questioned as to any point which went to criminate himself, or to bring him to dis-honour or discredit, or which went to impeach his integrity or veracity. There were guards thrown around a juror, which the court would not suffer to be removed or broken down so as to expose him to the shafts of reproach or ridicule. But he contended that this protecting system could not by any possibility be construed into a right to extract from a juror, his private opinions upon any subject he was called upon to determine ; that if a juror has made use of any expressions unfavourable to the accused, which shew partiality or an undue bias, prisoner must prove it by affidavit, and the court is bound to reject him. 6 State Trials, 59. 3 Jacob, (new edition,) 577. He then quoted, Mr. Justice Foster, Crown Law, 7. upon the doctrine of challenges, where it is laid down that a juror may be examined whether he is a freeholder or not; but not as to his dishonour or discredit. In 4th Hawkins, 399. it is *316 Mid to.be a good cause of challenge if a juror has declared, his opinion on the guilt of a prisoner, or said that, he ought to be hung or the like ; but these declarations, being susceptible of proof, they should be proved. The same doctrine, he observed, was laid down in 1 Salk. 153. One Cooke being indicted for high treason, and the jury called, he offered to ask the jurors, in order to challenge them, if they had not said, he was guilty or would be hung. Et per Curiam, This is a good cause of challenge % but then the prisoner must prove it by witnesses, not out of the mouth of a juryman $ a juryman may be examined on his voire dire, whether he hath any interest in the cause, or whether he hath a freehold", for these do not make him criminal 5 but, said the conrt, you shall not ask a witness or juryman, whether he had been whipped for larceny, or ever committed to Bridewell as a pilferer, or to Newgate for'clipping and coining; or whether he is a villian or out* lawed; because these would make a man discover that of himself which tends to shame, crime, infamy or misdemeanor ; so, said the court, it is in this case ; the answer would charge him with misdemeanor or misbehaviour. Now, if a prisoner is clearly debarred of the right of asking these questions, where the party has made use of these expressions, and the prisoner is put to the proof of them by witnesses,, surely there is no principle in the common law which goes further, and says, you may purge the juror’s conscience and make him declare the internal operations of his own mind, where he has made use of no such expressions. The Attorney-General *317 was bold to say, there was no such principle ever laid down by any writer of the criminal law, in the country from whence we derived our system of jurisprudence, or in any of the common law courts in this * , , , . , „ , country. The old common law right of peremptory challenges pro causa, had ever been deemed a sufficient security for prisoners in this state, from its first settlement to the present day, and he never heard of any complaint to the contrary. He admitted that the case of Aaron Burr was an exception -to the contrary ; there the jurors, as they came forward to be sworn, were asked and interrogated as to their prejudices and opinions on the guilt or innocence of the prisoner. But then it is to be recollected that that case was tried in a Federal Court under the constitution of the United States, which, was not governed by common law rules and principles, but by those arising out of the spirit and meaning of the constitution itself, and, therefore, ought not to be considered as a binding authority in a state court, bound by the common law and governed by its rules.
I have given the arguments in this case, for and against the motion, the best consideration in my power, and the result of my opinion is, that the motion for a new trial ought to be rejected. If ever there was a fair and impartial .mode of impaneling jurors for the trial of offences in any country, it surely is in ours : So jealous is the law on this point, that it will not even trust the officers of the court to select or draw their names out of the jury box, but *318 innocence itself (if I may be allowed the expression) is directed by our jury law to draw them out from among the hundreds of freeholders and taxable inhabitants, whose names are there deposited. The law reqUjres a child, under ten years of age, should draw out of the box the jurors’ names, one by one singly, which is handed to the sheriff in open court, who reads aloud each name, which is taken down by the clerk, and is inserted in the panel annexed to the venire. These are the men directed by law to be summoned by the sheriff, to sit upon the trials in our courts of justice. By these means every possible chance of a sheriff’s picking a jury, or selecting prejudiced and improper men, (so much as complained of in other countries,) is entirely removed. Our jurymen, therefore, may well be considered what the law says, they ought to be, liberos et legales ho-mines, When such men, thus chosen, are summoned into our courts of justice, the fair presumption of law is, that they bring along with them minds free from partiality and undue bias; predisposed to do justice to their fellow citizens according to the laws of the land, and the evidence which may be produced before them ; and it would be a high misdemean- or in them, after being thus selected by ballot for these important purposes at least six months before the setting of the court, to form hasty opinions or strong prejudices against any unfortunate man who may come before them, or to prejudge the case of any one before they had fully heard all the evidence and arguments for and against him. Where any expressions are made use of by them to that effect, *319 they are deemed unworthy of sitting upon so solemn an occasion.
From this view of the subject, it is easy to perceive how much the courts of justice are bound to protect and defend this body of men, from every possible imputation which may be cast upon their veracity, their honour or integrity. Jurors, upon such occasions should, like Csssar’s wife, not only be free from guilt, but even from suspicion. Under these circumstances, for the court to permit jurymen to be interrogated, as to their prejudices or previous opinions upon the subject-matter which they were about to try, before they were sworn, would, in my opinion, be the strongest evidence of injurious suspicions against them, derogatory to their honour and integrity as honest and just men.
Let me ask, what is the plain and obvious meaning of such kind of interrogatories ? Is it not telling jurymen, “ you are such a weak or wicked set of il men that we are suspicions of you; we are afraid te that you may have come to court prejudiced i( against an unfortunate man, whom you are called (e upon to try; or that you have prejudged his case 6( before you have heard the evidence for and against tc him, and, therefore, we wish to sift and find out “ your sentiments before you are sworn, to the end ic that, if we do not like you, we may challenge “ ybu and prevent your sitting on the trial?” If this is not the intent and meaning of the right claimed by the counsel for the prisoner in the present *320 Case^ tfrgn I am at a loss to know what their intent- and meaning is. Such a mode of proceeding, if even it could be introduced into our courts, would, in my opinion be subversive of the very ends of jus-ráC£¡. £or every juryman, by having such offensive questions put to him, would have his passions roused to indignation, his temper ruffled and discomposed. Under such circumstances, his mind could not be in that mild and tranquil state which is essentially requisite to a fair, and impartial trial.
The principle contended for, appears to me to be at war with those of the common law; every man by those rules is supposed to be innocent, till his guilt is made apparent by due proof; and, by parity of reasoning, every man concerned in the administration of justice is supposed unbiassed and impartial till the contrary is made to appear. Now, this inquisitorial system is bottomed upon a supposed partiality and bias on the part of a juryman, who is to pass upon the trial of a man for his life, without any previous evidence whatever to prove or substantiate sueh partiality, which appears to me to be contrary to the wise and humane principles of the common law above alluded to. When a witness is called upon to give testimony, he is to relate facts, and never to give an opinion upon any subject, unless such opinion is the natural and fair deduction, or result of previously established facts. Yet, according to the doctrine contended for on this occasion, a juror is to be called upon to declare whether he has formed any opinion upon a subject concerning *321 which he has never heard one sentence of evidence offered.
As to the loose, random reports of the day out of court, they never can, nor ought to be, thought of sufficient consequence to merit a serious consideration in the sanctuary of justice. If, however, any mans ummoned as a juror, should be so lost to all sense of duty and shame as to form a hasty opinion upon such vague and idle reports, and to express it, such man, upon due proof of such declarations, should be rejected as unworthy to sit upon a trial where the life of a man is concerned. Indeed, it appears to me that such a conduct would not only be highly offensive in the eyes of God, but a high misdemeanor in law, for which he ought to be severely punished;
Upon looking into the authorities, I do not find a single case to support the doctrine contended fob in support of this motion, nor one dictum of law to warrant it. On the contrary, the very cases quoted in support of the motion seem to me to militate strongly against the principle. The case in 3rd Jacob’a, 576, (who by the bye was a mere compiler, does not mention his authority, goes further than any other case quoted in the argument. He says, “ that a juror may be examined as to any thing il which is not to his dishonour or discredit.” These words “ any thing,” are laid hold of to justify the principle insisted on ; to wit, that the prisoner has a right to ask the question of a juror, whether he has formed any opinion as to his guilt *322 or innocence. But this, in my opinion, is a very strained construction; for the words “ any thing,’7 cannot mean any thing legal or illegal. So wild an idea the author never could have intended to lay down as a rule of law; they must and ought to be circumscribed within the rules of law, and construed to mean any legal thing, as to his qualification as a juror, interest in the event, &c. or such like legal question, which may by the rules of the common law be asked of a juror. The very exception to the rule proves the reason and justice of this construction ; the words are, “ any thing which is not to his dishonour or discredit.” For my own part, I scarcely know a more unjust, dishonourable or discreditable act, than for a man concerned in the administration of justice, to make up bis mind, or to prejudge a case from idle rumor or report before he has heard the evidence. Now, a juryman, after he Is drawn and impanelled and comes forward to take his seat in a court of justice, forms a constituent branch of such court; indeed, upon matters of life and death, he is the most important member of the court. Any interrogation which goes to call in question his justice or integrity as an impartial juror, is, in my opinion, dishonourable and discreditable in the highest degree ; which shews the author never intended to extend the principle as far as was contended in the argument. Indeed the same author, in page 577, explains himself more fully and clearly, where he says, {< a juror may be examined u as to such causes of challenge which do not go to et his dishonour or discredit.” ' Such causes of *323 challenge, in the last paragraph, must, mean legal causes of challenge, or such as are within the rules of the common law; and this reconciles and explains the meaning of the author. Foster, page 7, is also , , i • , , very clear upon the same subject, and lays down the same principles. 4th Hawk. 399. says, “ if “ a juror has said a man would be hung or the like, it is good cause of challenge.” No man ever doubted that this was correct law; but then these declarations must be proved by affidavit. Cooke’s case in Salk. 153. is the last I shall observe upon ; and there the whole law is very clearly laid down. In that case, nearly the same questions were proposed or offered to a juror, which were propounded in the case under consideration. The prisoner offered to ask the juror if he had not said he was guilty, or would be hung; but was stopped by the court, who said, this is a good cause of challenge, but then the prisoner must prove it by witnesses, not out of the mouth of a juryman. In the conclusion of that ease, the court further said, that the answer, if in the affirmative, would charge the juror, with a misdemeanor or misbehaviour, and, therefore, would not suffer the question to be asked.
I have always found an extreme repugnance against innovating on the principles of the common ■ law, all of which appear to me to be founded in wisdom. Peremptory challenges, pro causa, have long answered the ends of justice in this country, as well as in Great-Britain, from whence we derived the elements of our legal system, and I never heard *324 any complaints for want of a fair and impartial trial in either country, while the rules of the common law were in full and fair operation.
j ¿rea(j innovations, and very much fear, if this principle were once introduced into our courts of justice, it would be productive of more delay and confusion than most men are aware of. Counsel at the instigation of criminals, would confuse and wound the feelings of jurors by irritating questions; and jurymen, on their parts, would claim the privilege of being heard in explanation, or of introducing witnesses to exculpate : So that more time would be lost in this conflict about the impartiality of jurymen, than in the investigation of the merits of the case. In the course of such a conflict, all the angry passions and resentments of men, would probably be enlisted ; and, in the end, an unfortunate prisoner would not have so good a chance for justice as under the good old common law mode of trial.
I am aware, it was allowed in Aaron Burr’s case, but all the world knows the delay and* confusion it occasioned, I am not in the least disposed to call in question the determination of the great legal character who presided on that trial. I know he stands pre-eminent in his judicial station ; but, as that was a great political question, in which the Union was divided in opinion, and parties at the time ran high 5 his anxiety for a fair and impartial trial induced him to go great lengths. After all, this was not a case which was governed by the rules of the common law. *325 but by the principles of the Federal Constitution, and the learned judge made his decision conformably to those principies. I cannot, therefore, consider that case, (however highly 1 esteem the legal character of that enlightened judge,) a§ an authority in our state courts, for offences against our state laws. For all these reasons, I am against the new trial, and think the motion should be dismissed.